MANNING CURTIS BRADSHAW
    & BEDNAR PLLC
Alan C. Bradshaw, #4801
Austin C. Sabin, #19667
201 South Main Street, Suite 750
Salt Lake City, Utah 84111
Telephone: 801-363-5678
Facsimile: 801-364-5678
abradshaw@mc2b.com
asabin@mc2b.com

*Attorneys for Plaintiffs The Freedom Network, LLC and Christopher Helvey*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| THE FREEDOM NETWORK, LLC, a Utah limited liability company, and CHRISTOPHER HELVEY, an individual<br><br>    Plaintiffs,<br><br>    vs.<br><br>FREEDOM ACADEMY FOUNDATION d/b/a FREEDOM PREPARATORY ACADEMY, a Utah non-profit corporation, AUSTIN ANDERSON, an individual, LINDSAY OWEN, an individual, PAUL BALTES, an individual, KEITH POWERS, an individual, REX GALBRAITH, an individual, BUDDY IVIE, an individual, GRAYSON WOLF, an individual, and STEVEN FINLEY d/b/a RED APPLE FINANCIAL,<br><br>    Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Case No.: 2:26-cv-119<br><br>Judge: |

Plaintiffs The Freedom Network, LLC ("TFN") and Christopher Helvey, by and through

undersigned counsel of record, verify and complain against Defendant Freedom Academy

Foundation d/b/a Freedom Preparatory Academy ("FPA" or "School"), Austin Anderson,

Lindsay Owen, Paul Baltes, Keith Powers, Rex Galbraith (collectively, the "Board Defendants"), Buddy Ivie, and Grayson Wolf (with the Board Defendants, the "FPA Individual Defendants") and Steven Finley d/b/a Red Apple Financial ("Finley/Red Apple") as follows:

## PARTIES, JURISDICTION, AND VENUE

1. TFN is a limited liability company organized under the laws of the state of Utah, with a principal place of business in Utah, engaged in providing staffing services to party FPA.

2. Helvey is an individual residing in the State of Hawaii.

3. Helvey is the manager and sole member of TFN.

4. FPA is a non-profit charter school organization organized under the laws of the state of Utah, with a principal place of business in Utah.

5. Austin Anderson ("Anderson") is an individual residing in Utah. Mr. Anderson is FPA's Chief Administrative Officer and a member of FPA's Governing Board.

6. Lindsay Owen ("Owen") is an individual residing in Utah. Ms. Owen is FPA's Chief Financial Officer and a member of FPA's Governing Board.

7. Paul Baltes ("Baltes") is an individual residing in Utah. Mr. Baltes is a member of FPA's Governing Board.

8. Keith Powers ("Powers") is an individual residing in Utah. Mr. Powers is a member of FPA's Governing Board.

9. Rex Galbraith ("Galbraith") is an individual residing in Utah. Mr. Galbraith is a member of FPA's Governing Board.

10. The foregoing five members of FPA's Governing Board are subject to Utah Code Ann., § 53G-5-505(2), which states that a "charter school governing board, the nonprofit

2

corporation under which the charter school is organized and managed, and the school are solely liable for any damages resulting from a legal challenge involving the operation of the school."

11. Grayson Wolf ("Wolf") is an individual residing in Utah. Ms. Wolf is the Executive Director of FPA.

12. Buddy Ivie ("Ivie") is an individual residing in Utah. Mr. Ivie is the Director of Operations of FPA.

13. Steven Finley ("Finley") is an individual residing in Utah and, according to records filed with the State of Utah, is the applicant doing business as "Red Apple Financial". Red Apple Financial operates primarily in the State of Utah.

14. This Court has jurisdiction over Plaintiffs' federal constitutional claims pursuant to 28 U.S.C. Code §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because they are so related to the federal claims that they form part of the same case or controversy.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all defendants reside in the State of Utah and a substantial part of the events giving rise to this claim occurred in this judicial district.

## GENERAL ALLEGATIONS

16. TFN is a private company that specializes in providing comprehensive operational staffing and services to charter schools.

17. FPA is a multi-campus non-profit educational institution established to provide education to students in grades K-12.

18.     FPA is authorized by the Utah State Charter School Board and funded by public monies. As such, it is a public school and a governmental entity or state actor for purposes of 42 U.S.C. § 1983.[1]

19.     The FPA Individual Defendants, in their capacities as Board Members or administrative officers of a public charter school, acted under color of state law in their actions described herein.

## I.     HISTORY OF THE PARTIES.

20.     Helvey's relationship with FPA began in 2004, when his children began attending FPA's charter school, Freedom Preparatory Academy (the "School").

21.     Soon thereafter, Helvey was nominated to FPA's Governing Board. Over the years, he has since held several positions with the School, including Treasurer, Bookkeeper, Business Manager, Principal, and Director of Finance.

22.     In 2019, Helvey founded TFN with co-founders Lynne Herring and Buddy Ivie. Herring acted as FPA's Executive Director through much of 2023, although Wolf obtained the title of Executive Director by at least October 12, 2023.

23.     Helvey, Herring, and Ivie intended for TFN to provide staffing and consulting services to the School and give employees of the School the option to forgo benefits such as health insurance and 401K contributions in exchange for a higher salary.

24.     This flexibility provided to employees allowed the School to save money, remain competitive with nearby schools, and to retain talented teachers.

---

[1] *See Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 830 (10th Cir. 2016) "[C]harter schools are public schools using public funds to educate school children. As this case and the Schools Act amply demonstrate, charter schools are not free-floating entities unmoored from state governmental oversight and control."

25.    After participating in a Request-for-Proposal process, FPA awarded TFN the right to operate employment staffing services for the School. As confirmed in Governing Board minutes from November 18, 2021, the staffing program FPA sought and that TFN agreed to provide was unique and the first of its kind "drafted by FPA attorneys with support from Utah's Division of Purchasing." TFN was awarded the contract after the Governing Board created "a scoring matrix to help choose the firm [and TFN] scored highest on the matrix." *See* Exhibit A, November 18, 2021 Board Minutes.

26.    On December 22, 2021, the Governing Board approved a contract between FPA and TFN in a 5-0 vote with no opposition stated in Governing Board minutes: "Paul Baltes expressed his delight with being able to give FPA employees alternative pay options like this. Jay Garlock agreed. Robert Merrill noted the value of this innovative program; "it gives teachers salary choices and incentivizes them to stay with FPA." *See* Exhibit B, December 22, 2021 Board Minutes.

27.    Thereafter, new employees hired by the School had the option to work directly for FPA—and receive health insurance and 401K contributions—or be employed through TFN—and receive a higher salary. The contract saved FPA substantial salary costs and that savings is a principal reason the Governing Board approved the contract. With respect to 401k contributions, having an employee on TFN's payroll instead of FPA's payroll saves mandatory 401k contributions of 9% for every full-time employee with up to an additional 5% savings for employees who elected to make voluntary contributions that must be matched by FPA up to 5%. Additionally, savings of 17%-30% of salaries have been obtained for employees who would otherwise elect health insurance benefits, an overall salary savings of 26-44%.

28.     Until this dispute arose, approximately 80 employees—50 teachers and 30 staff (the "Employees")—worked at the School and were employed through TFN.

29.     In May of 2022, Helvey offered to purchase Ivie's and Herring's interest in TFN.

30.     In June of 2022, Ivie and Herring agreed to sell their interests, and Helvey became TFN's sole principal and manager.

## II.     THE FREEDOM ACADEMY EMPLOYMENT AGREEMENT.

31.     On or about July 1, 2021, Helvey—in his individual capacity—and FPA entered into the Freedom Academy Employment Agreement (the "FAE Agreement"). A true and correct copy of the FAE Agreement is attached hereto as Exhibit C.

32.     Under the terms of the FAE Agreement, FPA was to employ Helvey as its Director of Finance. Ex. C, *FAE Agreement*, § 2.

33.     Under the FAE Agreement, Helvey and FPA agreed that Helvey's employment would continue for "a period of 5 (five) years until July 1, 2026." *Id*. at § 3(a).

34.     The FAE Agreement required Helvey to devote his "full-time and attention to the performance of the duties assigned by Employer" and to "adhere to the *Freedom Academy Employee Handbook*." *Id*. at § 3(b) (emphasis in original).

35.     Under the FAE Agreement, Helvey was to receive an annual salary of $188,000. *Id*. at § 5(a). That amount was to be adjusted each year on July 1, "as set forth in subsection (b) until the expiration of the [FAE] Agreement." *Id*.

36.     The FAE Agreement also contains an Appendix outlining other benefits to which Helvey was entitled. *Id.* at Appendix A.

37.     The FAE Agreement provides for a "minimum percentage raise" to this salary, "based on the Cost of Living Adjustment (COLA) percentage raise." *Id*. at § 5(b).

38.     COLA refers to the Cost-of-Living Adjustment announced each year by the Social Security Administration, which publishes an annual figure that governs increases in social security payments.

39.     In addition to this salary increase, the FAE Agreement also entitled Helvey to receive $500 of car allowance each month for the duration of the FAE Agreement, to be increased by 5% each year. *Id*. at § 5(c).

40.     The FAE Agreement permits FPA to terminate Helvey "after a determination by a supermajority of FPA's Governing Board that cause for termination exists as specified in the Freedom Academy Employee Handbook." *Id*. at § 6 (emphasis in original).

41.     The FAE Agreement provides that, in the event of default or breach, "the defaulting party shall pay reasonable attorney fees incurred by the other party in seeking enforcement of" the FAE Agreement. *Id*. at § 14.

42.     The FAE Agreement is subject to Utah law. *Id*. at § 9.

## III.     THE MASTER SHARED SERVICES AGREEMENT.

43.     On or about December 22, 2021, TFN and FPA executed the Master Shared Services Agreement (the "MSS Agreement"), effective January 1, 2022. A true and correct copy of the MSS Agreement is attached hereto as Exhibit D.

44.     As part of the MSS Agreement, FPA and TFN agreed that the employment contracts for all FPA "employees, managers, officers, or contractors" then under contracted employment with FPA would be "tolled until such time as [the MSS Agreement] is terminated or such Contract Employee no longer provides services to FPA under the terms of this [MSS Agreement]." Ex. D, *MSS Agreement* at § 2(e).

45.     Pursuant to this tolling clause, FPA and TFN agreed that "the running of the term of employment in any Employment Contract shall be tolled during all such time periods and the term shall be extended for the requisite period of time." *Id*.

46.     The FAE Agreement, as a contract between Helvey and FPA, is subject to this tolling clause. As such, Helvey's employment with FPA was tolled upon the effective date of the MSS Agreement—January 1, 2022.

47.     Accordingly, six months of the stated 5-year term of the FAE Agreement has transpired—the remainder has been tolled following the January 1, 2022 effective date of the MSS Agreement.

48.     The MSS Agreement further explains that "each Contract Employee shall be considered a third-party beneficiary of this Section 2(e) and shall have the right to enforce this Section 2(e) directly." *Id*.

49.     The MSS Agreement required TFN to provide its services "in a timely, competent, and workmanlike manner and in a nature and at level Consistent With Past Practice." *Id*. at § 3.

50.     Under the MSS Agreement, TFN was appointed as FPA's agent to, among other things, "negotiate agreements, insurances, and benefits for FPA Staff and FPA Activities." *Id*. at § 6.

51.     The MSS Agreement contains a term provision of five years, running from the effective date. *Id*. at § 7.

52.     FPA and TFN were both entitled to terminate the MSS Agreement in the event of a material breach, subject to the following provision (the "MSS Termination Provision"):

8

> (b)    Termination. Except as otherwise provided in any Schedule, either Party may terminate this Agreement at any time in the event that the other Party materially breaches this Agreement and, if the material breach is capable of cure, such material breach continues uncured for a period of sixty (60) days after written notice thereof; provided, however, in the event that the breaching Party has in good faith commenced such cure within such 60-day period, but cannot practically complete such cure within such 60-day period, the breaching Party shall have an additional fifteen (15) day cure period. The foregoing notwithstanding, in the event a material breach is incapable of cure, without limiting any other rights of the non-breaching Party, including the right to seek injunctive relief, the non-breaching Party shall have the right to terminate this Agreement only if (i) the breach is the result of ongoing willful misconduct by the breaching Party, and (ii) the breaching Party is not providing cooperation to mitigate the breach. Any termination of this Agreement under this Section 7(b) will not affect the Foundation's obligation to make full payment for all services actually rendered under this Agreement prior to such termination or the Parties' obligations with regard to other Schedules still in force.

*Id*. at § 7(b).

53.    Notably, if the material breach is capable of cure, the MSS Termination Provision requires that the terminating party only terminate the MSS Agreement after "a period of sixty (60) days after written notice thereof." *Id*.

54.    In the event that a material breach is incapable of cure, the non-breaching party may terminate the MSS Agreement "only if (i) the breach is the result of ***ongoing willful misconduct*** by the breaching Party, ***and*** (ii) the breaching Party is not providing cooperation to mitigate the breach." *Id*. (emphasis added).

55. The MSS Agreement includes an insurance and hold harmless provision:

> (a)    Claims and Liability. Each Party agrees to look only to the appropriate insurance coverages in effect pursuant to this Agreement in the event any demand, claim, action, damage, loss, liability or expense occurs as a result of injury to person or damage to property, regardless of whether any such demand, claim, action, damage, loss, liability or expense is caused or contributed to, by or results from the negligence of the other Party or its subsidiaries, affiliates, employees, members, managers, directors, officers, agents or independent contractors, and regardless of whether the injury to person or damage to property occurs because of the Company Services being provided by the other Party or otherwise as a result of the performance of this Agreement. Nevertheless, in the event the insurance proceeds are insufficient or there is no

insurance coverage to satisfy the demand, claim, action, loss, liability or expense, each Party agrees, at its expense, to indemnify and hold the other Party and its subsidiaries, affiliates, members, managers, officers, directors, employees, agents and independent contractors harmless to the extent of the liability or excess liability, as the case may be, unless such liability or excess liability arises by reason of any act or omission of the other Party or any of its agents, members, managers, directors, officers, employees or representatives, which act or omission *is* grossly negligent, willful misconduct or outside the scope of the other Party's authority as provided herein.

*Id.* at § 13(a).

56.    The MSS Agreement includes a mediation provision (the "MSS Mediation Provision") which requires that the parties "attempt in good faith to resolve any dispute or claim arising out of or relating to [the MSS Agreement] promptly by confidential mediation. . . before resorting to litigation." *Id*. at § 14(f)(iv).

57.    That MSS Mediation Provision provides that, "if the Parties agree to terminate mediation. . . then either Party may initiate a litigation action." *Id*.

58.    The MSS Agreement also contains a provision on confidentiality, which designates as confidential all information designated as such by either party, as well as all information the recipient would reasonably know is confidential. *Id*. at § 5.

59.    The MSS Agreement is subject to Utah law. *Id*. at § 14(e).

60.    The MSS Agreement contains a "Schedule A," which outlines the company services to be provided to Foundation by TFN, including the number of teachers and staff to be provided and the estimated costs. *Id*. at p. 13.

10

## IV.    TFN'S AND FPA'S COURSE OF DEALING.

61.    Each year, pursuant to the MSS Agreement, Helvey would prepare a letter mirroring the "Schedule C," attached to the MSS Agreement that outlined FPA's expected staffing needs. A copy of such notices is attached to this Complaint as Exhibit E.

62.    After either the CAO or CFO of FPA signed the letter, FPA would send it to TFN.

## V.    FPA'S FINANCIAL TROUBLES.

63.    In recent years, the School has faced significant financial challenges including stagnant enrollment.

64.    These challenges have been exacerbated by several bonds that have, since 2017, subjected FPA to two relevant bond covenants. A copy of one such bond is attached to this Complaint as Exhibit F.

65.    Among these constraints, FPA is subject to a bond covenant which requires it to maintain "Net Income Available for Debt Service in an amount equal to at least 1.10 times the Annual Debt Service Requirements on all Indebtedness then outstanding" (the "1.10 Ratio Covenant"). Ex. F, p. 19.

66.    FPA is also required to "maintain unrestricted Cash on Hand in its operation fund such that on each testing date the amount on deposit in such fund shall be sufficient to cover at least 45 days of the Charter School's Operating Expenses for the prior Fiscal Year" (the "Cash Carryover Covenant" and collectively with the 1.10 Ratio Covenant, the "Bond Covenants.") *Id*. at p. 18

67.    Both the 1.10 Ratio Covenant and the Cash Carryover Covenant were measured as of June 30 of each year. *Id*. at p. G-8.

68.    Helvey, in his position as the Business Manager, was aware of these challenges and he worked diligently with the Governing Board and School Administration to remedy them.

69.    As early as June of 2023, Helvey notified the Governing Board and School Administration that FPA's net assets were shrinking, he raised the alarm on cash shortages, foresaw a "tough year with the audit," and suggested diverting money to a savings account to help satisfy the Cash Carryover Covenant. A transcript of the recording from the June 20, 2023 meeting is attached to this Complaint as Exhibit G.

70.    That month, to ensure sufficient cash in FPA's coffers to satisfy the Cash Carryover Covenant, FPA took out a $1.5 million loan on June 30, 2023, and repaid the balance on August 2, 2023—32 days later.

71.    The subsequent year, on June 30, 2024, the School borrowed $2.5 million and repaid the balance on July 3, 2024—4 days later.

72.    These short-term loans were taken by the Governing Board to ensure compliance with the Bond Covenants.

73.    To aid the situation, Helvey also repeatedly counseled FPA leadership and the Board to reduce staffing levels and cut costs, to no avail as was known at that time by Defendant Grayson Wolf and Defendant Buddy Ivie and the Governing Board members, and FPA's then Executive Director, Lynne Herring.

74.    As a consequence of these Bond Covenant constraints, FPA had no other viable option than to either make 401k employee benefit contributions or to timely pay its payroll tax obligations.

75.    On October 12, 2023, the Governing Board named Wolf as its new Executive Director in consideration of Lynne Herring's anticipated retirement at the end of 2023.

76.     In 2024, the IRS raised concerns that FPA had still not caught up on its payroll taxes, and Helvey met with an IRS representative in October of that year. Texts between Helvey and Wolf corroborate these meetings and demonstrate that Wolf was in discussions with Helvey about the IRS's situation and Helvey and Wolf agreed to retain outside legal counsel to interact with the IRS. Wolf signed a power of attorney at the time to allow outside counsel to interact with the IRS. Screenshots of texts on the subject are attached to this Complaint as Exhibit H.

77.     Helvey had also raised these matters with board member Austin Anderson, on October 30, 2024. Texts show Helvey mentioning to Anderson the "IRS debt we have" and Helvey asked Anderson to discuss the matter. Screenshots of these texts between Helvey and Anderson are attached as Exhibit I.

78.     The next month, in November of 2024, Helvey brought up the IRS obligations to the Board, discussing the "huge IRS bill" that they were working to get "ticked away. . . and paid off." A transcript of the recording from the November 22, 2024 Board Meeting is attached to this Complaint as Exhibit J.

79.     On December 2, 2024, a "Schedule of Findings and Management Responses" was posted to the Utah State Auditor's Website, disclosing that "[n]umerous required payroll liability EFTPS [Electronic Federal Tax Payment System] were not made in a timely manner," that "[d]eposits were delayed for cash flow purposes," and that management of the School had "consulted a representative of the Internal Revenue Service to arrange for payment of late deposits, interest, and penalty." This is a publicly filed document.[2]

---

[2] A copy of this document may be found in the database at the following website: reporting.auditor.utah.gov/searchreports/s/

80.    In January of 2025, Helvey and Wolf met to discuss an IRS letter that was sent to Wolf relating to the outstanding debt.

81.    To address the shortfall, Helvey worked to obtain the necessary financing to pay down the IRS obligation. In February of 2025, he arranged for a family trust (the "Trust") to provide the School with a $1 million loan to be paid back over 5 years at 7% interest. A copy of the Note is attached as Exhibit K.

82.    The details of this loan were disclosed and voted on at the February 4, 2025 Governing Board meeting. A transcript of the February 4, 2025 Board Meeting is attached to this Complaint as Exhibit L.

83.    Therein, it was explicitly mentioned that this financing was "to cover our IRS obligation." *Id*. All present, including defendants Lindsay Owen, Paul Baltes, Keith Powers, and Austin Anderson, voted to approve the financing. *Id*.

84.    On February 5, 2025, Anderson texted Helvey, asking about another School matter. Helvey replied, mentioning that it was almost resolved, but that "[w]e needed to get the IRS situation taken care of." Helvey then asked Anderson if he would have time to discuss an update regarding the IRS. *See* Ex. I.

85.    Helvey subsequently arranged an additional $595,000 in financing from the Trust when the IRS would not allow a payment plan due to the FPA's bank holdings required to meet the Bond Covenants. Helvey informed Wolf by text on February 11, 2025, of the additional financing opportunity. A copy of this text is attached to this Complaint as Exhibit M.

86.    This subject was also discussed with the board at the February 20, 2025 meeting. The Governing Board approved that additional financing 4-0 with no opposition. A copy of the minutes of this meeting is attached to this Complaint as Exhibit N.

14

87. This additional $595,000 loan was paid off within the year—though the $1 million loan still remains an outstanding obligation of FPA.

88. Defendants Anderson, Owen, Baltes, Powers, Wolf, and Ivie were all present at that meeting. *Id.*

89. On March 20, 2025, Helvey and Wolf texted regarding the IRS obligation—specifically that because the School needed large cash reserves on hand pursuant to the 1.10 Ratio Covenant, and because the School was working towards maintaining 45 days of cash on hand—the IRS was unwilling to allow a payment plan. *See* Exhibit H.

90. In that text conversation, Wolf agreed that paying employee 401k contributions first was more important than paying the IRS. *Id.*

91. On May 21, 2025, following several discussions about the relationship between FPA and TFN, Anderson asked Helvey for payroll information for all TFN employees.

92. Helvey was uncomfortable with the request—as TFN was a contractor and the information requested was confidential—but Helvey provided the information to Wolf, Anderson, and Owen with an express statement that such information be protected as confidential. To that end, he shared only a paper copy and did not disclose an electronic version of TFN's payroll.

93. On June 18, 2025, the Governing Board conducted a meeting discussing in detail the financial state of the School. At that meeting, Helvey discussed the School's savings, financing for the IRS obligations, and bonding covenants in depth. A copy of the minutes of the June 18, 2025 Board Meeting is attached to this Complaint as Exhibit O.

94.     On November 18, 2025, Helvey sent a Schedule C letter to Wolf's email, asking her to forward it to Owen for signature, and not Anderson as Anderson's wife was an employee of TFN.

95.     This was in keeping with several years of past practice between FPA and TFN and is required by Schedules A and C of the MSS Agreement.

96.     On November 19, 2025, following additional requests for TFN's confidential information, Helvey provided Anderson, Owen, and Wolf with the breakdown of TFN's employee's salaries, along with a comparison of what those people would be paid on FPA's payroll. A copy of that email is attached to this Complaint as Exhibit P.

97.     In that email, Helvey stated that "[m]any items on this spreadsheet are confidential. *Id*.

98.     That attached spreadsheet demonstrates that, by contracting with TFN, FPA was saving in excess of $500,000 on annual payroll.

99.     On information and belief, this request of payroll data was not made for the Board's proper governance purposes but was a pretextual excuse to calculate TFN's in-house costs and shop around for an alternative. Alternatives, however, could not be pursued without misuse of TFN's confidential information and without a knowing and intentional breach of the MSS Agreement negotiated with the State of Utah's input through the Utah Division of Purchasing.

100.     On information and belief, to this end, Defendants shared that spreadsheet and its confidential information with third parties, soliciting contracts with competitors to TFN including specifically Finley/Red Apple. FPA pursued this intentional breach of contract and

16

violation of TFN's property rights despite knowing that it could terminate the MSS Agreement without cause at the end of 2026 with a proper advance notice.

101. When Finley/Red Apple received TFN's confidential information from the FPA, Anderson, and Wolf, it knew that the listed employees were employed by TFN, that the information was confidential and that it had no right to receive or use such information. Nonetheless, Finley/Red Apple thereafter sought to misuse such confidential information to enrich itself and knowing that doing so would interfere with the MSS Agreement and the approximately 80 contracts between TFN and its employees. Finley/Red Apple's actions include making material misrepresentations at a public meeting held on January 23, 2026 with bondholders and others.

## VI. HELVEY OBTAINED NECESSARY APPROVALS.

102. At all times during Plaintiffs' and Defendants' relationship, Helvey discussed with members of the Board and/or members of the School's executive team all non-routine decisions made to maintain the School's fiscal stability.

103. Purchases that Helvey may have made involving more than $50,000 of School funds were always made with the approval of other members of School leadership and the Governing Board and the School's executive team and the COO always received and signed off on all financial transactions including by reviewing and signing all bank and credit card statements.

## VII. FPA PURPORTS TO TERMINATE THE AGREEMENTS.

### a. FPA Communicates to Helvey

104. On Thursday, January 8, 2026, Anderson asked Helvey to present a financial report in the Governing Board Meeting. Shortly thereafter, Helvey received a text from Austin

Anderson, Chief Administrative Officer of FPA. A screenshot of that text is attached hereto as Exhibit R.

105.    In that text, Anderson states that

> "the Board [of FPA] took action **_today_** to terminate the shared services agreement with The Freedom Network, LLC and to end your employment with Freedom Preparatory Academy, effective immediately. These decisions were made for governance and compliance reasons. Effective immediately, you no longer have authority to act on behalf of the School or to communicate with staff regarding School matters. We ask for your cooperation in preserving records and respecting these boundaries. A formal written notice will follow."

*See* Ex. R (emphasis added).

106.    FPA's Board had failed to properly notice this meeting. Utah Code Ann. § 52-4-202(6)(a) states that a public notice of a Board Meeting "shall provide reasonable specificity to notify the public as to the topics to be considered at the meeting. Each topic shall be listed under an agenda item on the meeting agenda."

107.    FPA's Board did provide some notice of the meeting and revised that notice twice. Copies of the notice and its subsequent revisions are attached as Exhibit S.

108.    The original version of the notice vaguely states: "Possible Board action regarding staffing and/or contract matters." *See id*.

109.    The first revision removes this sentence, and the second revision re-adds the sentence. *Id*.

110.    In any event, this notice does not approach the "reasonable specificity to notify the public as to the topics to be considered at the meeting" required by Utah Code Ann. § 52-4-202(6)(a).

18

111.   Nor did FPA provide advance notice of the MSS and FAE Agreement terminations by any other medium. Prior to receipt of Anderson's text and even after, TFN received no notification of any alleged material breach of contract by TFN or its Business Manager (Helvey) or of any intention of FPA or its Board to terminate TFN's contracts with either TFN or Helvey.

112.   Nor was Helvey aware of any displeasure or perceived by FPA or the Board regarding either Helvey's or TFN's performance under the Agreements.

113.   Subsequently, on Friday, January 9, 2026, Anderson sent Helvey and TFN three untitled documents.

### b.   The Purported MSS Termination Notice

114.   The first of these documents is styled as "formal notice that the Governing Board of [FPA] has voted in open session to terminate the [MSS Agreement] between the School and [TFN]." A copy of this MSS Termination Notice is attached as Exhibit T.

115.   The MSS Termination Notice further states that "[t]he Board [of FPA] determined that continuation of the [MSS] Agreement is not in the best interests of the School and presents unacceptable financial and operational risk. This action is taken pursuant to the Board's fiduciary authority, applicable provisions of the Agreement, and Utah law." *Id*. The MSS Termination Notice does not state any basis to terminate that contract prior to the end of 2026 and no such basis exists under the contract's terms.

116.   This termination of the MSS Agreement constituted an official policy decision made by the final policy makers, i.e., the Governing Board of FPA.

c.    *The Purported FAE Termination Notice*

117.    The second such document is also a termination notice but pertains instead to the FAE Agreement. A copy of this FAE Termination Notice is attached to this Complaint as Exhibit U.

118.    The FAE Termination Notice is addressed to Mr. Helvey, stating that while "the Board [of FPA] acknowledges the reinstatement of your previously tolled employment agreement. . . the Governing Board, by supermajority vote and in accordance with your employment agreement and the FPA Employee Handbook, voted to terminate your employment for cause, effective immediately." Ex. U.

119.    The FAE Termination Notice purports to justify this termination by stating that "this determination is based on the Board's finding that your conduct and performance fall within categories of misconduct expressly identified in the Employee Handbook, including but not limited to: Incompetence or inefficiency in the performance of duties; Failure to devote full time and efforts to FPA [School] duties and responsibilities; Violation of negotiated agreements; Conduct materially harmful to the organization." *Id*. (cleaned up).

120.    A copy of the Freedom Preparatory Academy Employee Handbook (the "Handbook") is attached to this Complaint as Exhibit V.

121.    Contrary to FPA's representations in the FAE Termination Notice, the Handbook does not "expressly identif[y]" any grounds on which a "for cause" termination may be based. *See generally*, Ex. V.

122.    The FAE Termination Notice otherwise provides no specific basis, instance, or conduct for Helvey's termination. Ex. U, *FAE Termination Notice*.

20

123.    Notably, the FAE Termination Notice clarifies that "[t]he Board expressly made **no finding of criminal conduct, fraud, or personal intent**." *Id.* (emphasis in original).

124.    This termination of the FAE Agreement constituted an official policy decision made by the final policy makers, i.e., the Governing Board of FPA.

### d.    The Litigation Hold Notice

125.    The third document is addressed to Helvey individually and styles itself as "formal notice that [FPA] is instituting a litigation hold and directing the immediate preservation of records." This Litigation Hold Notice is attached as Exhibit W.

126.    The Litigation Hold Notice states that FPA "reasonably anticipates litigation, audits, regulatory inquiries, or enforcement matters arising from or relating to financial management, accounting, tax reporting, shared services, and related governance matters during the period in which you and/or [TFN] provided services to [FPA]." Ex. W.

127.    That Litigation Hold Notice further instructs Helvey and TFN to preserve and refrain from destroying information relevant to these anticipated disputes. *Id.*

128.    Contrary to its false statements of outstanding unresolved issues on January 9, 2026, on or about December 30, 2025, Anderson and Owen certified under oath to the State that:

> I have reviewed the annual financial report of Freedom Preparatory Academy for the year ended June 30, 2025. Based on my knowledge, the annual report does not contain any untrue statement of material fact or omit to state a material fact that would cause the statements to mislead. Based on my knowledge, the financial statements, and other information provided to the Office of the State Auditor, fairly presents in all material respects the financial condition and results of operation of Freedom Preparatory Academy for the year ended June 30, 2025. The other certifying officer and I are responsible for the fair presentation of financial reports and for the design, implementation, and evaluation of the internal control over financial reporting for Freedom Preparatory Academy.

Ex. Y.

## VIII.    FPA CO-OPTS TFN'S EMPLOYEES.

129.    On January 12, 2026, Grayson Wolf—Executive Director of FPA—and Buddy Ivie—Director of Operations for the same—sent a letter to the approximately 50 teachers and 30 staff members employed by TFN providing services for FPA (the "Employees"). A copy of that letter is attached as Exhibit Z.

130.    That letter states to the Employees that "Chris Helvey is no longer associated with Freedom Preparatory Academy. . . [and that] employment for staff previously paid through [TFN] will transition to Freedom Preparatory Academy." *See* Ex. Z.

131.    That letter states that "this transition does not interrupt [the Employees'] service to the school" and that they will "now be employed directly by Freedom Preparatory Academy." *Id*.

## IX.    PLAINTIFF'S DEMAND LETTER.

132.    On January 14, 2026, counsel for Plaintiffs sent a demand letter to FPA (the "Demand Letter"). A copy of that Demand Letter is attached as Exhibit AA.

133.    Therein, Plaintiffs demanded that FPA "[s]pecify and identify particular facts and evidence meriting the alleged terminations of the MSS Agreement and the FAE Agreement, including those facts which support your potentially defamatory statements regarding Mr. Helvey's conduct." Ex. AA, p. 6.

134.    By that Demand Letter, Plaintiffs also requested that FPA agree to commence mediation in line with Section 14(f)(iv) of the MSS Agreement. *Id*., pp. 5-6.

## X.    FPA'S RESPONSE.

135.    On January 15, 2026, Counsel for FPA responded, sending Plaintiffs a response to the Demand Letter (the "Demand Letter Response."). A copy of that Demand Letter Response is attached as Exhibit BB.

136.    Therein, FPA misrepresented that it had identified "material financial, compliance, and governance issues attributable to Mr. Helvey and the Freedom Network, LLC, which Mr. Helvey was unable or unwilling to adequately explain, address or remediate despite repeated requests from the Board and School administration." Ex. BB, p. 1.

137.    These statements are false. Helvey received no such "repeated requests," nor was there any financial, compliance, or governance issues attributable to either Plaintiffs' conduct.

138.    In the Demand Letter Response, FPA further misrepresented that the Board had "requested information from Mr. Helvey relevant to specific concerns regarding financial management, transparency, payroll practices, tax compliance, cash positions, and related regulatory and contractual obligations. . . [and that] satisfactory explanations and assurances were not forthcoming." Ex. BB, p. 1.

139.    These statements are also false. Helvey had, at all relevant times, provided any information that the Board requested.

140.    FPA further misrepresented that it had "identified communications and draft materials purporting to request significant transfers of School funds that were neither authorized nor approved by the Governing Board. . . [that] were intercepted before any action was taken." Ex. BB, p. 2. These statements are also false, no "interception" of any action occurred and the Freedom Network instead performed under the MSS Agreement including its Schedules A and C.

23

141. FPA further declined to mediate, falsely stating that Helvey's "failure to address identified issues, and ongoing regulatory, audit, and financial remediation process and investigations" made mediation "not appropriate or productive." *Id*.

142. As such, Plaintiffs have satisfied all pre-litigation obligations or were excused from doing so by Defendants' refusal.

## XI. DEFENDANTS' FALSE DECLARATIONS.

143. In responding to Plaintiffs' Motion for TRO in a prior proceeding, Anderson and Wolf made sworn declarations in which they falsely testified that Helvey failed to communicate the IRS tax matter to Defendants. *See* Exhibits CC and DD.

144. These declarations are replete with false statements.

145. For instance, Anderson states that the Board first learned about Bond Covenant concerns through an April 21, 2025 Letter of Awareness from the State Charter School Board. Ex. CC, ¶ 9.

146. In reality, the evidence shows that Helvey notified the Board of the Bond Covenant concerns as early as June of 2023—almost two years earlier. *See* Ex. G, June 20, 2023 Board Meeting. While Anderson was not on the Board at that time, those meetings are a matter of public record, and several current board members and FPA employees were present, including Defendants Ivie, Wolf, and Baltes.

147. As a Board member, Anderson had a fiduciary duty to review publicly available information regarding FPA.

148. As such, Anderson's statement that he was unaware is either a lie or represents his failure to fulfill his fiduciary duty as a Board member to FPA by reviewing publicly available documents before providing false statements to a court.

24

149. Anderson further contends that the Board first became aware of the payroll tax matter upon receipt of an IRS Notice—referring to notice sent January 21, 2025. Ex. CC, ¶ 7.

150. This is despite the fact that Helvey had raised those concerns with Anderson personally, in writing, in October of 2024. *See* Ex. I.

151. Anderson then indicates that the Board "made repeated requests for explanations, documentation, and financial records from Mr. Helvey. . . [and that Helvey] did not provide sufficient information to address or resolve the Board's concerns." Ex. CC, ¶¶ 13, 15.

152. There were no such repeated requests. The transcripts of the Governing Board meetings are a matter of public records, and Anderson cannot point to any actual request made to Helvey that was not adequately answered privately or publicly and his statements to the contrary are false.

153. Anderson further contends that "[t]he Board acted within its statutory authority to terminate Mr. Helvey's employment and the arrangement with The Freedom Network, LLC." *Id*. at ¶ 19.

154. The Board possesses no such statutory authority to prematurely terminate contracts, particularly the MSS Agreement negotiated with the input of the State of Utah; and Anderson cites to none. *Id*.

155. Defendant Wolf similarly submitted a declaration, misstating that "[p]rior to receipt of formal correspondence from the Internal Revenue Service in 2025. . . I was not informed by Christopher Helvey that [the School] had failed to timely pay required federal employment taxes." Ex. DD, ¶ 5.

156. These statements are false and are directly contradicted by written communications; Helvey's and Wolf's texts reveal that Wolf knew of the IRS issues as early as October of 2024. *See* Ex. H.

157. Wolf's predecessor, Lynne Herring, likewise knew of relevant facts at all times, including in 2023.

158. She further misstates that "[t]he IRS notice documenting failure to timely pay employment taxes was the first time I became aware that employment tax obligations had not been satisfied in ordinary course." Ex. DD, ¶ 7. This is also false as contradicted by written communications.

159. She further misstates that "[a]t no time prior to receipt of the IRS notice did Mr. Helvey explain to me. . . that employment taxes were unpaid or overdue. *Id*. at ¶ 8. This is also false and appears to be an intentional misrepresentation to a court.

160. Wolf also contends that prior to April 2025, she had not received a clear explanation of why cash reserves had fallen below expectations, how long that condition had existed, or why short-term loans were necessary to cover obligations. *Id*. at ¶ 10.

161. This is also false as proven by public records. Wolf was at the June 2023 Board Meeting, where Helvey discussed the finances of the School in detail, including cash-on-hand concerns and concerns about upcoming audits. *See* Ex. G.

162. She also misstates that she "participated in multiple requests for information directed to Mr. Helvey seeking explanations, documentation, and corrective plans" and that these requests were not satisfied. *Id.* at ¶¶ 11-12.

163. This is false. She can also point to *no such unsatisfied request for explanation or information,* despite the meetings of the Board being matters of public record.

164. Wolf also states a confession that FPA stole TFN's employees, stating that following Helvey's termination she "oversaw implementation of transition measures to ensure uninterrupted payroll" and that "[n]o employee missed pay as a result of the transition." *Id.* at ¶¶ 14-15.

165. Defendants also attached an unsigned declaration of Defendant Owen, *See* Exhibit EE, p. 3-4, similarly full of misstatements.

166. These represent clear, fraudulent misstatements made in furtherance of FPA's contractual breaches and theft of TFN's employees, made under oath.

## XII. THE FALLOUT OF DEFENDANTS' ACTIONS.

167. FPA did not timely make its January 1, 2026 payment on the still-outstanding $1 million loan that Helvey had arranged to pay off the IRS debt, triggering a default interest rate of 18%.

168. The representative of the Trust, issuer of the loan, was aware of the drama unfolding at FPA and its termination of its contracts with Helvey and TFN.

169. Following a lack of payment on January 1, 2026, or cure by January 11, 2026, the Trust notified the FPA that it had invoked the acceleration clause of the note without notice as allowed by the Note's terms. A copy of this Notice of Default is attached as Exhibit FF.

170. In that Notice of Default, Counsel for the Trust stated that "the entire balance [is] immediately due and payable as of Freedom Prep's January 11, 2026 default [and] Freedom Prep must pay the entire accelerated balance, including all principal, accrued interest (at the default rate) fees, and costs, to the Trust within the next two weeks. Failure to do so will cause our office to file suit against Freedom Prep in backing of the Trust for collection under the Note." The letter also states:

27

> Please note that our client feels compelled to take this course of action based upon her belief that recent actions taken by the board of directors of Freedom Prep against Chris Helvey and TFN are very likely to impinge Freedom Prep's ability to continue to make the monthly payments due under the Note on a timely basis and to make the balloon payment at the Maturity Date defined in the Note.

*Id*.

171.    Subsequently, on January 23, 2026, FPA held a yearly Investor Call, the public notice of which is attached as Exhibit GG. Defendants Anderson, Wolf, as well as their legal counsel, were on that call along with Finley/Red Apple.

172.    On that call, Wolf repeated prior untrue defamatory misstatements regarding Helvey, including that he had been terminated for "lack of transparency in financial operations." A transcript of this Investor Call Recording is attached as Exhibit HH. *See*, discussion beginning at timestamp 3:22, bullet point 8.[3]

173.    When the $1 million dollar loan was discussed, Wolf made affirmative misrepresentations that FPA could and would continue making monthly payments as scheduled without disclosing FPA's failure to timely pay the January 2026 payment on January 11, 2026, that the default rate of 18% was in place and that the entire obligation was due and monthly payments were not possible. *See id*. at discussion beginning at timestamp 11:48.

174.    Wolf knew that the continued monthly payment schedule was no longer an option and yet misrepresented to the bond investors that it was, and did so in furtherance of Defendants wrongful acts.

---

[3]Utah Code Ann. § 52-4-203(5): "All or any part of an open meeting may be independently recorded by any person in attendance if the recording does not interfere with the conduct of the meeting."

175. Despite several minutes of conversation on the matter, *no one on the call disclosed acceleration of the Note* despite Anderson and Erin Preston (counsel for Defendants)—both direct recipients of that notice—being present on that call. *Id.*

176. Not only have Defendants made gross, intentional misrepresentations *to investors*; this gaping failure to state the truth was made in furtherance of the FPA's breach of contracts and theft of TFN's employees, and the FPA Individual Defendants' and Finley/Red Apple's interference with contracts with Helvey and TFN and defamation of Helvey.

177. Finley also stated on the call that Finley/Red Apple had been retained as a replacement for Helvey "for 2 weeks." *Id*. at timestamp 13:40. *See also id.* at discussion beginning at timestamp 39:40.

178. This two-week period indicates that the Board orchestrated an arrangement with Finley/Red Apple in advance of Helvey's termination with the expressly stated purpose to allegedly save money by breaching the MSS Agreement that it had no right to terminate a year early.

179. On information and belief, Defendants shared TFN's confidential information and payroll data with Finley/Red Apple in order to facilitate its replacement of TFN and in order to allegedly "save the School over half a million dollars" through intentionally tortious conduct.

180. This conduct is tortious and a violation of Section 5 of the MSS Agreement, and TFN designated the contents of that document as confidential. *See* Ex. D.

181. Finley specifically misrepresented that by replacing TFN, Finley/Red Apple would save the School approximately $500,000 and bypass a "9.2% fee" being charged by TFN on top of the salaries of its employees. *Id.*

182. These statements are false. The MSS Agreement with TFN was explicitly entered into by TFN and FPA in order to save FPA money in paying salaries by not being obligated to pay 9-14% for mandatory 401k benefits and increased salary costs of 17-30% for health insurance. Not only have salary costs increased by approximately *26-44*%, substantially more than a 9.2% "fee" due TFN under the MSS Agreement, but teachers and staff no longer have the option to choose higher salary over benefits. Anderson and Owen knew of these substantial savings pursuant to Helvey's email to them on November 19, 2025. Ex. P.

183. In disparaging Helvey and blaming the School's financial troubles on Helvey, Wolf also misrepresented at this public meeting that the School's troubles were due to Helvey and not stagnant or declining enrollment. In response to specific questions from bondholders, Wolf misrepresented: "*In our best estimation, that elementary campus* [the Provo, Utah campus] is *situated in a neighborhood that's kind of phasing out age-wise*. **Our vineyard campus is in a booming, new, young family area, as well as our St. George campus.**" *See* Ex. HH.

184. In reality, the Vineyard Campus's enrollment as reported publicly had declined substantially or been stagnant: October 2022–534; October 2023–552; October 2024–505; and October 2025–508. Wolf made these misrepresentations to bondholders in an effort to place blame on Helvey and away from herself and FPA's current Governing Board.

185. On February 5, 2026, the Trust's counsel identified for FPA's counsel how the Governing Board's actions had resulted in increased salary costs, created concern for "teachers who … may have made commitments, financial or otherwise, based upon higher salaries paid by TFN", resulting in "profound concern with FPA's ability to repay the Note." A copy of this communication is attached as Exhibit II.

186.    FPA and Finley/Red Apple have also continued to seek TFN's electronic accounting files and data that are held in a proprietary accounting software program called Pelorus, which represents another attempt by Defendants to misappropriate TFN's confidential information.

## XIII.    DEFENDANT'S FURTHER MISSTATEMENTS TO THIRD PARTIES

187.    On February 2, 2026, Counsel for FPA sent a GRAMA Request Letter to the City of Woodland Hills, another employer of Helvey, seeking records pertaining to Helvey. A copy of that Letter is attached to this Complaint as Exhibit JJ.

188.    That letter states that "Mr. Helvey [had] provided the School with no notice of his employment with Woodland Hills and any conflicts that may have existed in that role."

189.    This is false. Helvey had worked for the city of Woodland Hills for more than two decades, of which FPA's representatives were well aware. Specifically, Defendants Buddy Ivie and Grayson Wolf both knew, as did former FPA executives Lynne Herring and Cary McConnell.

### FIRST CAUSE OF ACTION

*Deprivation of Property Interest Without Due Process Pursuant to 42 U.S.C. § 1983*
*(Against FPA and the FPA Individual Defendants)*

190.    Plaintiffs incorporate by reference all preceding paragraphs herein.

191.    Plaintiff Helvey possessed a constitutionally protected property interest in his continued employment with FPA. This interest arose from the FAE Agreement, which provided for a fixed term of employment with a remaining term of 4.5 years (tolled and extended), and which permitted termination only for cause.

192.    Defendants, acting under color of state law, deprived Helvey of this property interest by terminating his employment "effective immediately" on January 8, 2026.

31

193. This deprivation occurred without due process of law. Specifically, Defendants failed to provide Helvey with:

   a. Adequate notice of the specific charges or reasons for termination prior to the decision;

   b. An explanation of the employer's evidence; and

   c. An opportunity to present his side of the story, i.e., a pre-termination hearing before the decision was made.

194. The decision to terminate Helvey without due process was an official act of the FPA's Governing Board, the final policymakers for the entity, resulting in liability against the FPA.

195. This decision to terminate was taken under color of state law.

196. The Individual Defendants participated in this deprivation objectively unreasonably and in violation of clearly established law regarding public employees' rights to due process regarding fixed-term contracts.

197. As a direct result, Helvey has suffered damages, including lost wages, benefits, and emotional distress.

## SECOND CAUSE OF ACTION

*Deprivation of Liberty Interest Without Due Process Pursuant to 42 U.S.C. § 1983*
*(Against All Defendants)*

198. Plaintiffs incorporate by reference all preceding paragraphs.

199. Plaintiff Helvey possesses a constitutionally protected liberty interest in his good name, reputation, honor, and integrity.

200. In connection with the termination of his employment, Defendants, acting under color of state law, made public, stigmatizing, and false statements regarding Helvey.

32

201.    Specifically, Defendants published to School employees, investors (via the January 23 call), and the community that Helvey was terminated for "lack of transparency," and alleged malfeasance regarding tax and bond covenant obligations.

202.    Defendants further published misstatements to the city of Woodland Hills, defaming Helvey by stating that he had not been honest with FPA regarding his employment there.

203.    These statements are false and have seriously damaged Helvey's standing and associations in his community and foreclose his freedom to take advantage of other employment opportunities in the charter school finance sector.

204.    These statements were made by the Individual Defendants in their capacity as Board Members and administrative officers of FPA and were therefore taken under color of state law.

205.    Defendants deprived Helvey of his liberty interest without due process by failing to provide him with a name-clearing hearing.

206.    As a direct result of this deprivation of liberty, Helvey has suffered damages, including reputational harm, emotional distress, and loss of future earning capacity.

### **THIRD CAUSE OF ACTION**

*Declaratory Judgment (Against FPA)*

207.    Plaintiffs incorporate by reference all preceding paragraphs herein.

208.    An actual, justiciable controversy exists between Plaintiffs and FPA regarding their respective rights and obligations under the MSS Agreement and the FAE Agreement.

33

209.    FPA has purported to terminate both the MSS Agreement and the FAE Agreement "effective immediately" without complying with the mandatory procedural and substantive requirements set forth in those agreements.

210.    Plaintiffs seek a declaration from this Court that:

a.    The MSS Termination Notice is defective and void for failure to identify a material breach or for-cause basis for termination and a failure to provide the mandatory sixty (60) day cure period required by Section 7(b) of the MSS Agreement;

b.    FPA lacked a substantive basis to terminate the MSS Agreement for "ongoing willful misconduct" under Section 7(b), particularly in light of FPA's own admission that there was no finding of fraud or personal intent;

c.    The FAE Termination Notice is void for failure to establish or identify "cause" and for failure to strictly adhere to the termination procedures required by Section 6 of the FAE Agreement;

d.    The MSS Agreement remains in effect, and the FAE Agreement remains tolled pursuant to Section 2(e) of the MSS Agreement; and

e.    FPA's unilateral "transition" of TFN's Employees to FPA payroll is an ultra vires act and a breach of the MSS Agreement.

**FOURTH CAUSE OF ACTION**

*Injunctive Relief (Against FPA)*

211.    Plaintiffs incorporate by reference all preceding paragraphs.

212.    Plaintiffs have no adequate remedy at law for the irreparable harm caused by FPA's ongoing efforts to dismantle TFN's business and co-opt its workforce.

34

213.    Pursuant to the MSS Agreement, TFN's primary asset is its specialized workforce and the operational systems it uses to manage FPA's multi-campus institution.

214.    FPA's January 12, 2026 letter to approximately 80 Employees and staff members was purposeful action to "transition" TFN's personnel to FPA payroll without any legal or contractual right to do so.

215.    Unless restrained, FPA's actions will result in:

 a. The permanent loss of TFN's trained workforce;

 b. The destruction of TFN's business reputation and goodwill; and

 c. The loss of specialized institutional knowledge and operational control that cannot be adequately compensated by money damages.

216.    Plaintiffs are likely to succeed on the merits of their breach of contract claims because FPA failed to comply with the mandatory sixty (60) day notice-and-cure period required by Section 7(b) of the MSS Agreement.

217.    The balance of equities favors Plaintiffs, as the requested injunction merely seeks to restore the status quo and prevent the unauthorized seizure of TFN's workforce.

218.    An injunction is in the public interest as it enforces the stability of contractual relations and prevents the summary termination of vital educational support services without following agreed-upon safety protocols.

219.    Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief:

 a. Prohibiting FPA from transitioning TFN's Employees to FPA's payroll;

 b. Requiring FPA to retract its January 12, 2026 letter to Employees; and

 c. Restoring Mr. Helvey's access and authority to School systems to the extent needed for FPA and TFN to perform under the MSS Agreement.

## FIFTH CAUSE OF ACTION

*Breach of the MSS Agreement (Against FPA)*

220.  Plaintiffs incorporate by reference all preceding paragraphs.

221.  The MSS Agreement is a valid and enforceable contract between TFN and FPA.

222.  TFN has performed all its material obligations under the MSS Agreement.

223.  FPA breached the MSS Agreement by, among other things:

    a.  Purporting to terminate the agreement "effective immediately" on January 9, 2026, in direct violation of the sixty (60) day notice and cure period required by Section 7(b);

    b.  Terminating the agreement without establishing the requisite "ongoing willful misconduct" and lack of cooperation required for an incurable breach under Section 7(b);

    c.  Unilaterally seizing control of TFN's workforce (the "Employees") and "transitioning" them to FPA's payroll, in violation of Section 9(a);

    d.  Refusing its obligation to mediate this dispute pursuant to Section 14(f)(iv).

224.  As a direct and proximate result of FPA's breaches, TFN has suffered and continues to suffer significant damages, including but not limited to loss of service fees, loss of its workforce/personnel, and damage to its business reputation, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

*Breach of the Covenant of Good Faith and Fair Dealing (Against FPA)*

225.    Plaintiffs incorporate by reference all preceding paragraphs.

226.    The MSS Agreement and the FAE Agreement both carry an implied covenant of good faith and fair dealing which requires the parties to act honestly and not undermine the benefits of the contractual relationships.

227.    FPA breached this covenant by using the pretext of "misconduct" to bypass the sixty-day cure period and the specific termination requirements of the MSS Agreement and by purporting to terminate the FAE Agreement without a legal basis to do so, and based upon conduct that allegedly occurred while that contract was tolled.

228.    FPA's actions—including the immediate lockout of Mr. Helvey and the summary "transitioning" of TFN's employees—were designed to deprive Plaintiffs of the benefit of their bargain and to allow FPA to co-opt TFN's operational structure without compensation.

229.    FPA's conduct was inconsistent with the agreed-upon common purposes and the justified expectations of the parties under the MSS Agreement and the FAE Agreement.

## SEVENTH CAUSE OF ACTION

*Breach of the FAE Agreement (Against FPA)*

230.    Plaintiffs incorporate by reference all preceding paragraphs.

231.    The FAE Agreement is a valid and enforceable contract between Mr. Helvey and FPA.

232.    Pursuant to Section 2(e) of the MSS Agreement, the FAE Agreement was tolled and remains a binding obligation of FPA.

233.    Mr. Helvey has performed all his material obligations under the FAE Agreement.

234.    FPA breached the FAE Agreement by, among other things:

    a.  Terminating Mr. Helvey's employment without "cause."

    b.  Refusing to pay Mr. Helvey his salary, COLA adjustments, car allowances, and other benefits as required by Section 5 and Appendix A of the FAE Agreement.

    c.  Purporting to terminate the FAE Agreement based upon conduct that occurred while that contract was tolled.

235.    As a direct and proximate result of FPA's breaches, Mr. Helvey has suffered and continues to suffer damages, including lost wages and benefits through the expiration of the contract term (4.5 years), in an amount to be proven at trial.

236.    Pursuant to Section 14 of the FAE Agreement, Mr. Helvey is entitled to an award of his reasonable attorney fees and costs incurred in enforcing the agreement.

## EIGHTH CAUSE OF ACTION

*Tortious Interference with TFN's Contractual Relations*
*(Against the FPA Individual Defendants And Finley/Red Apple)*

237.    Plaintiffs incorporate by reference all preceding paragraphs.

238.    TFN maintained existing contractual and business relationships with approximately 50 teachers and 30 staff members.

239.    Defendants had knowledge of these contractual relationships; indeed, these Employees provided services to FPA *through* TFN pursuant to the MSS Agreement.

240.    The FPA Individual Defendants and Finley/Red Apple intentionally and improperly interfered with these relationships by:

38

    a.  Sending the January 12, 2026 letter to the Employees falsely stating that Mr. Helvey was "no longer associated" with the School in a manner that implied wrongdoing;

    b.  Unilaterally "transitioning" those Employees to FPA's own payroll; and

    c.  Instructing TFN's personnel to cease communication with Mr. Helvey.

    d.  Finley/Red Apple's assistance in transferring employees to FPA including misuse of confidential information.

241.    Defendants' interference was executed through improper means, including misuse of confidential information, false and misleading statements to Employees and false and misleading statements in Notices, to investors and regulators and the unauthorized co-opting of TFN's entire workforce.

242.    Defendants' actions were not taken in good-faith governance of the School, but to appropriate TFN's workforce and evade contractual obligations in an admitted effort to save money that substantially increased the salary costs.

243.    These actions are the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference towards, and a disregard of, the rights of Plaintiffs.

244.    The FPA Individual Defendants and Finley/Red Apple have acted willfully and maliciously in making false statements and representations to third parties and investors regarding Plaintiffs Helvey and TFN.

245.    As a direct and proximate result of this interference, TFN has been deprived of its workforce and the economic benefit of its relationship with the Employees.

246.    In addition, TFN has been deprived of its ability to continue to operate in the charter school ecosystem entirely.

247.    TFN has suffered and will continue to suffer irreparable harm and monetary damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

*Defamation (All Defendants)*

248.    Plaintiffs incorporate by reference all preceding paragraphs.

249.    On January 12, 2026, FPA, through its agents Grayson Wolf and Buddy Ivie, published a written letter to approximately 80 TFN employees.

250.    The letter, combined with the circumstances of the purported terminations of the MSS Agreement and the FAE Agreement, contained false and disparaging statements and implications regarding Mr. Helvey's professional conduct and fitness.

251.    Finley/Red Apple also misrepresented that terminating the MSS Agreement a year early would save approximately $500,000—a statement that was knowingly false.

252.    FPA further misrepresented that Helvey had not been forthcoming about his employment with Woodland Hills, despite Helvey having been fully transparent regarding his employment and despite FPA's representatives being fully aware of the situation.

253.    These statements were made to third parties (the Employees and the city of Woodland Hills) and to investors and regulators.

254.    These actions are the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference towards, and a disregard of, the rights of Plaintiffs.

255.    Because the statements touch upon Mr. Helvey's professional reputation and trade, they constitute defamation *per se*.

256.    Similarly wrongful statements are contained in the declarations of both Defendant Anderson and Defendant Wolf, as well as the unsigned declaration of Ms. Owen.

257.    Likewise, Wolf's and Anderson's statements on the January 23, 2026 investor call constitute defamation, as stated publicly before third-party investors that Helvey had been properly terminated for lack of transparency and competence and that the School's financial problems were the result of malfeasance by Helvey.

258.    Mr. Helvey has suffered and continues to suffer damage to his professional reputation and emotional distress.

## TENTH CAUSE OF ACTION

*Violation of the Utah Uniform Trade Secrets Act, Utah Code Ann., § 13-24-1 et seq.*
*(Against All Defendants)*

259.    Plaintiffs incorporate by reference all preceding paragraphs.

260.    TFN is the owner of certain confidential business information and trade secrets, including employee ledgers, salary information, and operating costs.

261.    This information is not generally known to the public or to other persons who can obtain economic value from their disclosure or use.

262.    This information derives independent economic value, actual or potential, from not being generally known. Specifically, this information provided TFN with a competitive advantage in the charter school staffing market and constituted the core of its business model.

263.    TFN made reasonable efforts under the circumstances to maintain the secrecy of its Trade Secrets, including disclosing it only to a contractually-bound counterparty, FPA.

264. When it was disclosed to FPA, Helvey ensured that FPA was aware it was confidential. He disclosed it for the purpose of FPA's governance and financial review; not for the purpose of allowing FPA to disclose it to third parties.

265. Defendants "misappropriated" TFN's confidential trade secrets within the meaning of Utah Code Ann. § 13-24-2(2) by acquiring, disclosing, and using them without express or implied consent.

266. Defendants acquired the trade secrets through **improper means**, which included misrepresentation of FPA's true purposes for the information to Helvey and breach of the MSS Agreement.

267. Defendants used the trade secrets to incorrectly reverse-engineer TFN's cost structure, on-board TFN's employees to FPA, and shop payroll and human resource services to other third parties, including Finley/Red Apple.

268. But for the misappropriation of these trade secrets, Defendants would not have been able to successfully orchestrate the mass transition of 80 employees in a single weekend without significant operational disruption or financial risk.

269. Furthermore, Defendants would not have been able to have Finley/Red Apple service FPA for "a few weeks" as stated on the January 23, 2026 investor call, without soliciting their services prior to breach of the FAE and MSS Agreements.

270. As a direct and proximate result of Defendants' misappropriation, Plaintiffs have suffered and continue to suffer actual damages, including the loss of their workforce, the loss of contract revenue, and the diminution of the value of TFN's business.

271.    Defendants have been unjustly enriched by the misappropriation, as they have obtained a fully trained, operational workforce and the benefit of TFN's operational pricing strategies without paying for the value of those assets.

272.    Defendants' misappropriation was willful and malicious. Defendants Anderson, Wolf, Owen, and Finley/Red Apple acted with the specific intent to injure TFN and to secure a financial benefit for the FPA and Finley/Red Apple through deceitful acquisition of confidential data.

273.    Pursuant to Utah Code Ann. § 13-24-4, Plaintiffs are entitled to exemplary damages in an amount not exceeding twice the award made for actual damages and unjust enrichment.

274.    Pursuant to Utah Code Ann. § 13-24-5, Plaintiffs are entitled to an award of reasonable attorney fees.

## ELEVENTH CAUSE OF ACTION

*Unjust Enrichment, Pled in the Alternative (Against FPA)*

275.    Plaintiffs incorporate by reference all preceding paragraphs.

276.    In the alternative, if the MSS Agreement is found to be unenforceable or void, TFN has conferred a significant benefit upon FPA by providing professional staffing and operational systems.

277.    FPA has knowledge of this benefit and has acted to retain it by "transitioning" those employees and systems to its own control while refusing further payment to TFN.

278.    It would be inequitable for FPA to retain the benefit of TFN's workforce and operational infrastructure without payment of the reasonable value of those services.

43

## TWELFTH CAUSE OF ACTION

*Violation of the Open and Public Meetings Act, Utah Code Ann. 52-4-101 et seq.*
*(Against FPA and FPA Individual Defendants)*

279.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

280.    Defendant FPA is a "public body" as defined by Utah Code Ann. § 52-4-103(9), because it is a charter school governing board created by the Utah State Charter School Board and is supported by public funds.

281.    As a public body, the FPA's Governing Board is strictly subject to the requirements of the Utah Open and Public Meetings Act ("OPMA").

282.    The OPMA requires that a public body may only take final action in an open meeting for which proper public notice has been given, including an agenda that provides "reasonable specificity" of the topics to be considered. Utah Code Ann. § 52-4-202.

283.    On information and belief, the FPA's Governing Board purported to vote to terminate the MSS Agreement and the FAE Agreement and to "transition" TFN's employees during a meeting held on or about January 8, 2026.

284.    The FPA violated the OPMA in taking these actions in the following respects:

a.    The public notice and agenda for the January 8, 2026 meeting failed to list the termination of the MSS Agreement, the termination of Mr. Helvey's employment, or the acquisition of TFN's workforce with "reasonable specificity" as required by § 52-4-202(6)(a).

b.    While a public body may enter a closed meeting to discuss the "character, professional competence, or physical or mental health of an individual" (§ 52-

44

4-205(1)(a)), the same benefit does not apply to discussion of a contractual counterparty like TFN.

c. On information and belief, the Board discussed and decided to terminate the MSS Agreement and seize TFN's workforce during a closed executive session, rather than in an open public meeting.

285.   The termination of the MSS Agreement and the FAE Agreement effectively restructured the School's entire operational and financial model. These are matters of significant public interest that the OPMA is designed to protect from secrecy.

286.   Pursuant to Utah Code Ann. § 52-4-302, "any final action taken in violation of Section 52-4-201, 52-4-202, [or] 52-4-207 . . . is voidable by a court of competent jurisdiction."

287.   Because the purported termination of the MSS Agreement was taken in violation of the OPMA, this termination is void and without legal effect.

288.   Plaintiffs are entitled to a judicial declaration that the actions taken by the Board on January 8, 2026, regarding Plaintiffs are void.

289.   Plaintiffs, pursuant to Utah Code Ann. § 52-4-304, further challenge the legality of the closed meeting held in violation of the OPMA on January 8, 2026, and demand that the contents of that meeting be subjected to an in-camera review by this Court.

290.   Pursuant to Utah Code Ann. § 52-4-303(4), Plaintiffs are entitled to an award of reasonable attorney fees and court costs incurred in this action to enforce the provisions of the OPMA.

## PRAYER FOR RELIEF

WHEREFORE, Christopher Helvey and TFN respectfully request that the Court enter judgment in their favor and against Defendants as follows:

45

I.      **Declaratory Relief**

     a.   For a declaration that the MSS Termination Notice sent January 9, 2026, is null and void for failure to comply with the sixty (60) day notice and cure period required by Section 7(b) of the MSS Agreement;

     b.   For a declaration that the FAE Termination Notice is null and void for failure to establish "cause" and for failure to adhere to the board-governance procedures required by Section 6 of the FAE Agreement;

     c.   For a declaration that the FAE Agreement remains tolled and in full force and effect pursuant to Section 2(e) of the MSS Agreement;

     d.   For a declaration that FPA's unilateral "transition" of TFN Employees to its own payroll constitutes a material breach of Section 9(a) of the MSS Agreement; and

     e.   For a declaration that FPA's disclosure of TFN's payroll information to third parties constitutes material breach of Section 5 of the MSS Agreement.

II.      **Injunctive Relief**

     a.   For an order enjoining FPA from transitioning TFN's Employees to FPA's payroll or otherwise interfering with the contractual relationships between TFN and its personnel;

     b.   For an order requiring FPA to retract the January 12, 2026, letter sent to Employees and to issue a corrective statement;

     c.   For an order requiring FPA to issue a public retraction of their statements on the January 23, 2026 investor call regarding Helvey and the Note due to the Trust;

46

d. For an in camera review of the closed portion of the January 8, 2026 Board Meeting by this Court to determine that meeting's legality under the OPMA; and

e. For an order restoring Mr. Helvey's access to records to the extent needed to allow the parties to perform under the MSS Agreement.

III. **Compensatory and Tort Damages**

a. For actual and compensatory damages in favor of TFN in an amount to be proven at trial, including but not limited to unpaid service fees and the economic value of the lost workforce and business goodwill;

b. For actual damages in favor of Mr. Helvey, including unpaid salary ($188,000/year as adjusted by COLA), unpaid car allowances ($500/month as adjusted by 5% annual increases), and other benefits due through the remainder of the contract term ending July 1, 2026 (as extended by the tolling provision);

c. For general and special damages in favor of Mr. Helvey for defamation and injury to his professional reputation;

d. For actual damages caused by the misappropriation of trade secrets, and for exemplary damages in the amount equal to twice the damages awarded, for actual loss and unjust enrichment, pursuant to 42 U.S.C. § 1988(b).

e. In the alternative to the claims contending FPA's breach of the Agreements, for restitution and disgorgement of the value of the benefits FPA has unjustly retained by co-opting TFN's staffing and systems.

IV.    **Fees, Costs, and Interest**

    a.  For an award of reasonable attorney fees in favor of Mr. Helvey including pursuant to Section 14 of the FAE Agreement, Section 13(a) of the MSS Agreement, and violation of the Utah Uniform Trade Secrets Act;

    b.  For pre-judgment and post-judgment interest at the maximum rate permitted by Utah law; and

    c.  For such other and further relief as the Court deems just and equitable.

V.    **For Punitive Damages**

    a.  For an award of punitive damages against the Individual Defendants pursuant to:

        i.  42 U.S.C. § 1983, for their reckless and callous indifference to Plaintiffs' federal protected property and liberty interests,

        ii.  Utah Code Ann., § 78B-8-201, for conduct that was willful and malicious, and

        iii.  Utah Code Ann. § 13-24-4, in an amount not exceeding twice the award made for actual damages and unjust enrichment, for willful and malicious appropriation of Plaintiffs' assets.

Respectfully submitted this 10th day of February, 2026.

**MANNING CURTIS BRADSHAW &**
**BEDNAR PLLC**

/s/ Alan C. Bradshaw
Alan C. Bradshaw
Austin C. Sabin

*Attorneys for Plaintiffs Christopher Helvey and The*
*Freedom Network, LLC*

## *Verification Statement*

I, Christopher Helvey, being first duly sworn, depose and state that I am a Plaintiff in the foregoing action, that I have read the foregoing Complaint, and that the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Dated this 10th day of February, 2026

*/s/ Christopher Helvey*
Christopher Helvey

49

## CERTIFICATE OF SERVICE

The foregoing Verified Complaint is being served on the following individuals and entities as follows:

*Freedom Academy Foundation d/b/a Freedom Preparatory Academy*

Erin Preston
Counsel for Defendants
466 S. 500 E.
Salt Lake City, Utah 84102
erinpreston@utaheducationlaw.com

Kristin A. VanOrman
Shayla A. Slaymaker
Tanner J. Mullen
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, UT 84111
kvanorman@strongandhanni.com
sslaymaker@strongandhanni.com
tmullen@strongandhanni.com
Counsel for Defendants

Dated this 10th day of February, 2026,

/s/ Alan C. Bradshaw